2020 IL App (2d) 190443
No. 2-19-0443
Opinion filed October 6, 2020

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Boone County. |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 17-CF-386 |
| | ) | |
| KEVIN J. ANDERSON, | ) | Honorable |
| | ) | C. Robert Tobin III, |
| Defendant-Appellee. | ) | Judge, Presiding. |

JUSTICE BRENNAN delivered the judgment of the court, with opinion.
Presiding Justice Birkett and Justice Zenoff concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendant, Kevin J. Anderson, was charged with possession of a controlled substance (720 ILCS 570/402(a)(2)(B) (West 2016)) and possession of a controlled substance with intent to deliver (*id.* § 401(a)(2)(B)). The charges arose from a traffic stop that led to the discovery of a white rock-like substance in a vehicle in which defendant was a passenger. Defendant moved to suppress evidence recovered during the stop, on the basis that the stop violated constitutional protections against unreasonable searches and seizures. See U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6. The trial court initially denied the motion but then granted it after defendant moved to reconsider. The State then unsuccessfully moved to reconsider the order granting the motion to suppress and brought this appeal. We reverse and remand for further proceedings.

¶ 2                                    I. BACKGROUND

¶ 3     At the suppression hearing, the following pertinent testimony was provided. Illinois State Trooper Arthur Trillet testified that on November 30, 2017, he was on patrol on Interstate 90. At approximately 6:12 p.m., he stopped a Dodge Neon in which defendant was a passenger. Sheila Larson was driving the Neon, which was headed east. The Neon matched the description of a vehicle that was the subject of a "DUI callout," *i.e* , a report that a motorist appeared to be driving under the influence of alcohol or drugs. Before Trillet stopped the Neon, he observed it leave its lane of travel twice. He testified that the Neon had crossed partly into the adjacent lane.

¶ 4     As Trillet approached the Neon after pulling it over, he observed defendant put what appeared to be a large sum of money in his pocket. Trillet asked Larson if she had been drinking, which she denied. Trillet testified that he did not "smell any odors" and did not notice anything about Larson's appearance or behavior to suggest that she was under the influence of drugs or alcohol. Trillet asked Larson why she had not stayed within her lane, and she responded that she got nervous around traffic. Trillet elected to issue a warning and conversed with Larson in the squad car while it was being prepared. Larson told Trillet that she was being paid to drive defendant from Wisconsin to Chicago. Trillet arranged for a drug-sniffing dog to be brought to the scene. The dog alerted to the odor of narcotics. After searching the Neon and finding no drugs, Larson and defendant drove away from the stop.

¶ 5     Trillet encountered the same Neon again at approximately 11 p.m., travelling west on Interstate 90. Trillet followed the Neon. He observed the vehicle weaving within its lane and crossing over lane markers. Again concerned that the Neon's driver was impaired, Trillet pulled the vehicle over. As before, Larson was driving the vehicle and defendant was a passenger. Larson again showed no visible signs of impairment. Trillet informed Larson that he was going to ticket

her for failure to remain in her lane. He also arranged for a drug-sniffing dog to be brought to the scene. The dog again alerted to the odor of narcotics. The Neon was searched and a white rock-like substance that field-tested positive for cocaine was discovered in the glove compartment.

¶ 6    Trillet's squad car was equipped with a dashboard video camera, which recorded the Neon while Trillet followed it prior to each of the traffic stops. The camera also recorded Trillet's encounters with defendant and Larson after he pulled the Neon over. The trial court viewed the recordings and they were admitted into evidence.

¶ 7    Initially the trial court concluded that both stops were proper and denied the motion to suppress. With respect to the second stop, the court observed that the dashboard camera recording showed that the Neon was "going from one side of the lane to the other and crossing over the lane on a few occasions" before the stop and that there did "not appear to be any observable reason she could not stay within the lane. Very few cars are out and only two of them were in the adjoining lane at any period in time (and those vehicles passed her)." Based on that observation, the trial court ruled that Larson committed a traffic violation and that the traffic stop was therefore proper.

¶ 8    Subsequently, in granting defendant's motion to reconsider, the trial court instead found that "[t]he video of the second stop clearly shows that the vehicle in which the defendant was an occupant struck the lane [marker] on a few occasions, but at no point did the tires make contact with the pavement on the other side of the white line." The trial court noted that, pursuant to *People v. Mueller*, 2018 IL App (2d) 170863, merely touching the lane marker was no longer a traffic violation. With respect to the second stop, the trial court then concluded that Trillet lacked reasonable suspicion that the Neon's driver was under the influence of drugs or alcohol. The trial court noted, *inter alia*, that the DUI callout, received hours earlier, was "stale" because Trillet had

already conducted a DUI investigation. The trial court therefore suppressed the substance found in the glove compartment during the second stop.

¶ 9    In denying the State's motion to reconsider, the trial court elaborated as follows:

"[Trillet] did have concerns about the way that she was driving. He had concerns originally, pulled over to do an investigation for possible DUI, indicated didn't see anything, and not only that, but let her get back in the car and take off. Her driving was very similar to how it was the first time around. It's nothing different. He had concerns, rightfully so. She at best is a really lousy driver and is unable to keep the vehicle in between the two lanes on a regular basis. So he clearly had concerns. The question is whether or not those concerns based upon the knowledge that he had five hours, four hours earlier that at least in his mind she wasn't under the influence of anything. Whether those concerns rose to the level of reasonable and articulable suspicion as she was committing another offense, and I just don't think that his concerns would have risen to that level for a couple reasons. One is he saw a very similar driving pattern by that same driver of that same vehicle approximately four hours earlier. At that time he had the ability to do a DUI investigation, and not only did he not feel that there was probable cause to arrest her for that, he let her get back in the vehicle and drive that car away. So whatever concerns he may have had four or five hours later, and I use the word 'stale' in my decision, but I think that it's in a probable-cause world if we were issuing search warrants or arrest warrants, that that term probably is good still. I don't think his concerns—it's new. He can't forget what he saw before; that is, her driving was very similar. He did a DUI investigation, and he let her back out on the road."

The State filed a certificate of impairment and a timely notice of appeal.

¶ 10                                    II. ANALYSIS

¶ 11   The sole issue in this appeal is whether the second traffic stop, which led to defendant's arrest, was unconstitutional.

¶ 12   In reviewing a trial court's ruling on a motion to suppress, the trial court's findings of historical fact are (1) reviewed only for clear error, (2) given due weight as to any inferences drawn from those facts by the fact finder, and (3) reversed only when those findings are against the manifest weight of the evidence. *People v. Hackett*, 2012 IL 111781, ¶ 18. However, the reviewing court remains free to undertake its assessment of the facts concerning the issues and may draw its own conclusions when deciding what relief to grant. *Id.* The trial court's ultimate legal ruling as to whether suppression is warranted is subject to *de novo* review. *Id.*

¶ 13   In *Hackett*, the supreme court offered the following summary of the principles governing the constitutionality of traffic stops:

> "Vehicle stops are subject to the fourth amendment's reasonableness requirement. [Citations.] ' "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." ' [Citation.] However, as this court has observed, though traffic stops are frequently supported by 'probable cause' to believe that a traffic violation has occurred, as differentiated from the 'less exacting' standard of 'reasonable, articulable suspicion' that justifies an 'investigative stop,' the latter will suffice for purposes of the fourth amendment irrespective of whether the stop is supported by probable cause. [Citations.] A police officer may conduct a brief, investigatory stop of a person where the officer can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion. [Citation.] The officer's belief 'need not rise to the level of suspicion required for probable cause.' [Citation.] The distinction between these two standards may or may

not be relevant, depending upon the facts of the case under consideration and the [Illinois]

Vehicle Code provision at issue." *Id.* ¶ 20.

The test for determining the validity of a traffic stop is an objective one; the question is whether

reasonable suspicion actually existed, not whether the officer correctly articulated the basis for the

stop. *Cf. People v. Wolff*, 182 Ill. App. 3d 583, 586 (1989) (arrest actually supported by probable

cause was proper regardless of the arresting officer's subjective beliefs).

¶ 14    The State argues that the second stop was proper because Trillet observed the Neon touch

a lane marker, in violation of section 11-709(a) of the Illinois Vehicle Code (Code) (625 ILCS

5/11-709(a) (West 2016)), which provides, in pertinent part:

"Whenever any roadway has been divided into 2 or more clearly marked lanes for traffic

the following rules in addition to all others consistent herewith shall apply.

(a) A vehicle shall be driven as nearly as practicable entirely within a

single lane and shall not be moved from such lane until the driver has first

ascertained that such movement can be made with safety."

The State acknowledges our holding in *Mueller* that merely touching the lane marker does not

violate section 11-709(a), but it argues that it was improvidently decided and asks us to revisit it.

Alternatively, the State argues that, even if touching the lane markers was not a traffic violation,

when Trillet observed the Neon weaving within its straight lane without any obviously innocent

explanation, he had reasonable, articulable suspicion that the driver was impaired. Though we

decline the State's invitation to revisit our decision in *Mueller*, we agree with the State's alternative

argument.

¶ 15    It is well accepted in Illinois that erratic driving, including weaving within a single lane,

can give rise to reasonable suspicion that a driver is under the influence, justifying a traffic stop.

See *People v. Greco*, 336 Ill. App. 3d 253, 257 (2003) (and cases cited therein). Nonetheless, the trial court concluded that Trillet lacked reasonable suspicion that the driver was impaired, because he had observed Larson driving similarly five hours earlier and did not arrest her for DUI. The trial court essentially reasoned that Trillet was on notice that Larson was a bad driver and that these driving habits were no indication that she was impaired.

¶ 16 The trial court's reasoning gives Larson the benefit of one too many doubts. Accepting that Trillet determined at the first stop that Larson's erratic driving was not a function of impairment, there is no reason to assume this to be the case still some five hours later, when observing similar erratic driving. Neither the trial court nor Trillet knew what Larson's activities were in the intervening five hours. Perhaps, as the trial court speculated, Larson was merely a "lousy driver." However, lousy drivers can also be impaired drivers. What was known to Trillet, some five hours after the first stop, was that Larson was repeatedly weaving within her lane on a straight roadway, without an obviously innocent explanation. This gave Trillet reasonable suspicion to believe that she might be under the influence, and thus he had a basis to conduct an investigative stop. See *id.*

¶ 17 To escape the conclusion that Larson's erratic driving provided reasonable suspicion of impaired driving, defendant relies on *Mueller* for its holding that weaving within the lane and touching lane markings do not provide reasonable suspicion of impaired driving. 2018 IL App (2d) 170863, ¶ 29. Of course, holdings are not divorced from their factual contexts, and we note that in *Mueller* the State had forfeited the argument that the driving at issue provided reasonable suspicion to stop the vehicle independent of section 11-709(a) of the Illinois Vehicle Code. Moreover, quite apart from the forfeiture issue, the three touches of the lane markings in *Mueller* happened for a mile on a "twist[ing] and turn[ing] stretch of road" that was unlit in the early morning hours. (Internal quotation marks omitted.) *Id.* ¶ 10. Here, unlike in *Mueller*, the roadway was a multilane

straight interstate, and there was no discernible innocent explanation for Larson's repeated weaving within the lane. Thus, the weaving at issue provided reasonable suspicion to stop the vehicle and investigate possible driver impairment. See *Greco*, 336 Ill. App. 3d at 257.

¶ 18                                  II. CONCLUSION

¶ 19    For the foregoing reasons, the judgment of the circuit court of Boone County is reversed and the cause is remanded for further proceedings.

¶ 20    Reversed and remanded.

---

**No. 2-19-0443**

---

| | |
|---|---|
| **Cite as:** | *People v. Anderson*, 2020 IL App (2d) 190443 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Boone County, No. 17-CF-386; the Hon. C. Robert Tobin III, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Tricia L. Smith, State's Attorney, of Belvidere (Patrick Delfino, Edward R. Psenicka, and Barry W. Jacobs, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | James E. Chadd, Thomas A. Lilien, and Kerry Goettsch, of State Appellate Defender's Office, of Elgin, for appellee. |

---